**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHRISTOPHER DELMONICO, Derivatively on Behalf of Nominal Defendant SEQUENTIAL BRANDS GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>YEHUDA SHMIDMAN, KAREN MURRAY, GARY KLEIN, ANDREW COOPER, WILLIAM SWEEDLER, AL GOSSETT, AARON HOLLANDER, GARY JOHNSON, STEWART LEONARD, JR., MARTHA STEWART, RODNEY S. COHEN, and DAVID CONN,<br><br>Defendants,<br><br>and<br><br>SEQUENTIAL BRANDS GROUP, INC.,<br><br>Nominal Defendant. | Case No. |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Christopher Delmonico ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Sequential Brands Group, Inc. ("Sequential" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Sequential with the U.S. Securities and

Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.     NATURE AND SUMMARY OF THE ACTION

1.    Sequential owns a portfolio of consumer brands in the active and lifestyle categories, including brand names such as *Jessica Simpson*, *AND1*, *Avia*, *Joe's*, and *GALAM*.

2.    Between fourth quarter 2016 and third quarter 2017, the Company failed to record an impairment charge to its goodwill, despite knowing through internal calculations as early as December 14, 2016 that it was "more likely than not" that its goodwill was impaired.

3.    By avoiding recognizing an impairment charge, Sequential materially understated its operating expenses and net loss and overstates its income from operations, goodwill, and total assets.

4.    On March 16, 2018, Sequential filed its annual report on Form 10-K for the period ended December 31, 2017 in which it recorded a $304.1 million impairment to goodwill.

5.    On December 11, 2020, the SEC filed a lawsuit charging Sequential with "failing to impair its goodwill as required by accounting principles and federal securities laws." Among other things, the lawsuit stated that "If Sequential had timely recorded the impairment to goodwill for the fourth quarter of 2016, then Sequential's reported loss for 2016 have been 54 times larger. The impairment would have equaled 33 percent of recorded goodwill and 7.0 percent of total assets." *See Sec. & Exchange Comm'n v. Sequential Brands Group, Inc.*, Case No. 20-cv-10471 (S.D.N.Y.), Dkt. No. 1.

6.    On this news, the Company's stock price fell $2.03, or 11%, to close at $16.20 per share on December 11, 2020, on unusually heavy trading volume.

7.    At least half of the Company's current Board could not disinterestedly and independently respond to a litigation demand in connection with the misleading representations

because, among other things, three of the nine current directors are named as defendants herein in connection with their issuance of materially misleading statements, and three of the current directors are not independent.  As a result, a majority of the Board could not disinterestedly investigate whether their conduct constituted breaches of fiduciary duties under Delaware law.

## II.   JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violation of Section 14(a) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.   PARTIES

**Plaintiff**

10.     Plaintiff Christopher Delmonico purchased 2,250[1] shares of Sequential stock in November 2017 and has continuously owned his Sequential stock since that date.

**Nominal Defendant**

11.     Nominal Defendant Sequential is a Delaware corporation with its principal executive offices located at 1407 Broadway, 38th Floor, New York, New York 10018.  The Company's common stock trades on the NASDAQ exchange under the symbol "SQBG."

---

[1] This reflects the 1-for-40 reverse stock split effected on July 27, 2020.

**Defendants**

12.     Defendant Yehuda Shmidman ("Shidman") served as Chief Executive Officer ("CEO") from 2012 to April 2017.

13.     Defendant Karen Murray ("Murray") served as CEO of the Company from April 2017 to October 2019.

14.     Defendant Gary Klein ("Klein") served as Chief Financial Officer ("CFO") of the Company since from 2012 to September 2017.

15.     Defendant Andrew Cooper ("Cooper") served as interim CFO of the Company from September 2017 to February 2018.

16.      Defendant William Sweedler ("Sweedler") has served as Chairman of the Board of the Company since 2012.

17.     Defendant Al Gossett ("Gossett") has served as a director of the Company since 2011. He was a member of the Audit Committee at all relevant times.

18.     Defendant Aaron Hollander ("Hollander") has served as a director of the Company since 2013. He was Chair of the Audit Committee at all relevant times.

19.     Defendant Gary Johnson ("Johnson") has served as a director of the Company since 2013.

20.     Defendant Stewart Leonard, Jr. ("Leonard") has served as a director of the Company since 2013. He was a member of the Audit Committee at all relevant times.

21.     Defendant Martha Stewart ("Stewart") has served as a director of the Company since 2015.

22.     Defendant Rodney S. Cohen ("Cohen") served as a director of the Company from 2014 to May 2020.

23.     Defendant David Conn ("Conn") has served as CEO and a director of the Company since January 2020.

24.     Defendants Shmidman, Murray, Klein, Cooper, Lops, Sweedler, Gossett, Hollander, Johnson, Leonard, Stewart, Cohen, and Conn are sometimes referred to hereinafter as the "Individual Defendants."

**Relevant Non-Parties**

25.     John Dionne ("Dionne") has served as a director of the Company since November 2020.

26.     Silvia Mazzucchelli ("Mazzhucchelli") has served as a director of the Company since August 2020.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

27.     By reason of their positions as officers, directors, and/or fiduciaries of Sequential and because of their ability to control the business and corporate affairs of Sequential, at all relevant times, the Individual Defendants owed Sequential and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Sequential in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Sequential and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Sequential and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sequential, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Sequential, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

29.     To discharge their duties, the officers and directors of Sequential were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Sequential were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.     Audit Committee Charter**

30.     The charter of the Audit Committee provides that its members are responsible for, among other things, "the integrity of the Company's financial statements." To carry out this responsibility, the Audit Committee members must:

1. In consultation with the independent accountant and management, review the integrity of the organization's financial reporting processes, both internal and external.

\*       \*       \*

3. Consider the independent accountant's judgments about the quality and appropriateness of the Company's accounting principles as applied in its financial reporting. Consider alternative accounting principles and estimates.

4. Annually review major issues regarding the Company's auditing and accounting principles and practices and its presentation of financial statements, including the adequacy of internal controls and special audit steps adopted in light of material internal control deficiencies.

\*       \*       \*

6. Meet at least annually with the Chief Financial Officer and the independent accountant in separate executive sessions.

7. Review all analyst reports and press articles about the Company's accounting and disclosure practices and principles.

8. Review all analyses prepared by management and the independent accountant of significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any analysis of the effect of alternative generally accepted accounting principle ("GAAP") methods on the Company's financial statements and a description of any transactions as to which management obtained Statement on Auditing Standards No. 50 letters.

31.     As to documents and reports, the Audit Committee must:

1. Review and discuss with management and the independent accountant the Company's annual audited financial statements and quarterly financial statements (including disclosures under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operation") and the Company's earnings press releases and review and discuss with management any reports or other financial information submitted to any governmental body, or the public, including any certification, report, opinion or review rendered by the independent accountant, considering, as appropriate, whether the information contained in these documents is consistent with the information contained in the financial statements and whether the independent accountant and legal counsel are satisfied with the disclosure and content of such documents. These discussions shall include consideration of the quality of the Company's accounting principles as applied in its financial reporting, including review of audit adjustments (whether or not recorded) and any such other inquires as may be appropriate. Based on the review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited consolidated financial statements in the Company's annual report on Form 10-K.

2. Review and discuss with management and the independent accountant earnings press releases, as well as public financial disclosures. Review and discuss with

management earnings guidance. The Committee need not discuss in advance each earnings release but should generally discuss the types of information to be disclosed and the type of presentation to be made in any earnings release or guidance.

3. Review the regular internal reports prepared by management

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Background and Relevant Accounting Principles

32.     Sequential owns a portfolio of consumer brands in the active and lifestyle categories, including brand names such as *Jessica Simpson*, *AND1*, *Avia*, *Joe's*, and *GALAM*.

33.     The Company must prepare its financial statements in accordance with generally accepted accounting principles ("GAAP"), which are promulgated by the Financial Accounting Standards Board ("FASB") and codified as Accounting Standards Codification ("ASC").

34.     Goodwill is an intangible asset equal to the excess of the purchase price of a business over the sum of the fair value of the assets and liabilities of the acquired business. It signifies the value of the business's brand, customer base, and technology.

35.     Companies must record an impairment charge when the carrying value of goodwill exceeds its implied fair value. Goodwill becomes impaired when the acquired assets' ability to generate the cash flows anticipated at the time of the acquisition deteriorates, causing the fair value to fall below the book or carrying value. Goodwill impairment testing must be performed at the "reporting unit" level, which is an operating unit, i.e. a part of an enterprise that generates revenue and incurs expenses such that discrete financial information is available for the unit.

36.     Goodwill must be tested annually for impairments and on an interim basis when indicators (called triggering events) suggest that the reporting unit's value has declined. Specifically, interim impairment testing is required if an event occurs or circumstances change that would "more likely than not" reduce the fair value below the carrying value of a reporting unit.

*See* ASC 350-25-35-30. According to ASC 350-20-35-3C, relevant indicators of impairment include:

(a)     Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;

(b)     Industry and market considerations such as deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics, a change in the market for an entity's products or services, or a regulatory or political development;

(c)     Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

(d)     Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;

(e)     Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;

(f)     Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets; a more-likely-than-not expectation of selling or disposing all, or a portion, of a reporting unit; the testing for recoverability of a significant asset group within a reporting unit; or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit; and

(g)     If applicable, a sustained decrease in share price (considered absolutely and relative to peers).

37.     The above list is non-exclusive. Critically, "[i]f an entity has a recent fair value calculation for a reporting unit, it also should include as a factor in its consideration the difference between the fair value and the carrying amount" when deciding whether to perform a goodwill impairment test.

38.     At all relevant times, GAAP provided a multi-step process to assess whether goodwill is impaired. Under Step 0, a threshold qualitative assessment is made to evaluate whether or not the carrying value is more likely than not greater than the fair value of the reporting unit. If it were greater than the fair value, Step 1 would be performed to conduct a rigorous quantitative testing. Step 0 is "intended to reduce complexity and costs by allowing an entity the option to make a qualitative evaluation about the likelihood of goodwill impairment to determine whether it should calculate the fair value of a reporting unit."

39.     Alternatively, ASC 350 permits companies to skip Step 0 and proceed directly to Step 1. If Step 1 indicated that the carrying value likely exceeded fair value of the reporting unit, then ASC 350 requires the company to conduct further quantitative testing to determine the magnitude of the impairment.[2]

40.     Companies must maximize the use of relevant observable inputs (such as stock price in a public market) and minimize the use of unobservable inputs (such as management's subjective opinions). *See* ASC 820.

---

[2] In 2017, ASC 350 was updated to eliminate Step 2 and simplify the quantification of goodwill impairment if Step 1 indicated there was an impairment. Sequential adopted this standard, ASC 2017-04, during the first quarter of 2017.

**B.** **The Individuals Knew, or Should Have Known, That Sequential's Goodwill Was Likely Impaired**

**1.** **The Company's Declining Stock Performance and Earnings Estimates**

41. Because Sequential had grown through acquiring consumer brands, the Company had a substantial amount of goodwill. As of December 31, 2016, Sequential reported $1.3 billion intangible assets (constituting 93% of its total assets), $307.7 million of which was goodwill (or 21.4% of its total assets).

42. Over fiscal 2016 and 2017, the Company's industry performed poorly, and Sequential's stock price declined substantially, from $18.02 per share in July 2015 to $3.89 per share in March 2017. Accordingly, internal projections as well as analysts' estimates for the Company's earnings declined:

(a) In April 2016, Sequential projected EBITDA between $83 and $87 million for the fiscal year.

(b) By July 2016, the Company expected between $88 and $91 million EBITDA for fiscal 2016. When adjusted to exclude the results of a recent acquisition, the expected EBITDA was $79 million, or 7% below its guidance just three months prior.

(c) By November 2016, estimates had fallen to a range of $83 and $88 million EBITDA, and when adjusted for the acquisition, fell 12% below initial estimates to $75 million.

43. By the end of 2016, Sequential's stock price was approximately $4.68, or 40% below the trading price on October 1, 2016, its annual impairment testing date. The stock price had been declining for over a year, and a sustained decrease in stock price is an indicator of impairment. *See* ASC 350-20-35-3C.

### 2. The Individual Defendants Unreasonably Delay the Recognition of an Impairment to Goodwill

44. For its annual impairment test conducted as of October 1, 2016, the Individual Defendants caused Sequential to retain an external valuation consultant to conduct a quantitative assessment of the Company's fair value, using its market capitalization and adjusted for a control premium.[3] The external valuation consultant provided a report to Sequential on December 6, 2016 stating that this test showed the Company's goodwill was not impaired.

45. On or about December 14, 2016, defendant Klein forwarded the consultant's report to defendant Hollander, who asked "Do we meet the test today?" At the time, Sequential's stock price had fallen 37% since October 1, 2016. In response to the inquiry and at the direction of defendant Klein, the Company's senior accounting and finance personnel conducted an internal analysis using the same quantitative methodology used by the consultant but using Sequential's stock price as of December 14. According to this analysis, Sequential's fair value had fallen $63 million below its carrying value.

46. A subsequent analysis using the same quantitative methodology showed that as of December 31, 2016, Sequential's fair value was $96 million below its carrying value.

47. Therefore, no later than December 14, 2016, the Individual Defendants knew or should have known that the fair value of the Company's only reporting unit was less than its carrying value and thus that an impairment was necessary. Despite this objective evidence of impairment, the Company's senior accounting and finance personnel conducted a subjective, qualitative assessment to conclude that Sequential was undervalued and thus that its goodwill was not impaired.

---

[3] A "control premium" is the amount that a buyer would be willing to pay over the current market price to acquire a controlling stake in a company.

48.     In early February 2017, the Company's senior accounting and finance personnel conducted a qualitative analysis to "supplement" its memorandum for the annual impairment test. On February 3, 2017, the Vice President of Finance sent an email to defendant Klein stating that his team would "work on some qualitative talking points ***to support our company value*** as it relates to goodwill at 12/31/16" and that the external valuation consultant would gather quantitative facts "***to bolster our argument***." In doing so, personnel ignored objective evidence of an impairment. For example, the Vice President of Finance stated "***Our stance*** is that the ***drop in stock price does not constitute an impairment event*** that would necessitate an interim impairment test. In order to take that stance, we have to state that we believe an impairment is not more likely if we would perform that test."

49.     The Company's management recognized that Sequential would need to record a goodwill impairment. On February 16, 2017, the Vice President of Finance emailed defendant Klein, stating that "[the independent auditor] did not seem concerned or think that we should have an impairment, but that could change if/when they take a deeper look."

50.     The memorandum of Sequential's annual impairment test omitted key events that would be evaluated as potential indicators of an impairment. For example,

(a)     Retail shoe sales continued to decline. Defendant Klein sent an email to defendant Shmidman in fourth quarter 2016 with a sales trend report from a major retailer and stating "Some interesting and concerning trends here – inventory for shoes continues to decline—down 51% from PY [prior year]."

(b)     One of Sequential's key brands was in decline. In October 2016, defendant Klein received an analysis showing that the brand had a significant negative impact on the Company's results for the first three quarters of fiscal 2016. Specifically, the brand reported 30%

EBITDA margins (well below forecasts of 58% issued nine months earlier at the time of the acquisition). This brand, along with another with 40% EBITDA margins, reduced the Company's overall EBITDA margins by 9%.

      (c)    Budgeted costs for the brand were substantially higher than anticipated. Defendant Klein sent an email to defendant Shmidman with an analysis of the 2017 budget for the brand, including an unanticipated incremental costs of $13 million and the loss of $1.1 million in revenue.

      (d)    Bad debts were increasing. In October 2016, the Company's Controller informed defendant Klein of a write-off to accounts receivable exceeding $345,000 and an increase to bad debts reserve by $200,000. This was the third increase to the reserve for bad debts reserve during fiscal 2016.

      (e)    Key brands were declining. In December 2016, defendant Klein was notified of the following declines as part of periodic divisional reviews: (i) one brand's sales fell 26% during third quarter 2016 and 22% year-to-date; (ii) another brand's sales fell 12% year-over-year and 7% year-to-date; (iii) a third brand's sales fell 18% year-over-year and 12% year-to-date.

      (f)    The external valuation consultant had issued a research report in December 2016 showing, among other things, that Sequential's Expected Value / Next Twelve Months EBITDA had been falling since at least 2014.

    51.    Sequential's senior accounting and finance personnel prepared four drafts of the memorandum of its annual impairment test (the "Goodwill Memorandum"). None of them mentioned the results of the two market capitalization analyses performed as of December 14 and 31, 2016 which showed that the Company's goodwill was likely impaired.

52.     On February 23, 2017, Sequential's accounting and finance personnel forwarded the Goodwill Memorandum to the Company's independent auditor. The memorandum did not state, and the Company's personnel did not otherwise inform the auditor, that as of December 31, 2016, Sequential's carrying value exceeded its fair value by nearly $100 million.

53.     During 2017, additional triggering events suggested that the Company's goodwill was more likely than not impaired, including:

(a)     Sequential reduced its earnings projections twice within the span of three months;

(b)     The Company's stock price fell 16%;

(c)     A valuation by a third-party consultant on behalf of Sequential's lender suggested the fair value of the Company's goodwill was declining; and

(d)     Its CEO was removed.

54.     As a result of sustained decline in the stock price, the Company was not likely to pass its impairment test as of October 1, 2017 using its disclosed methodology. Sequential's senior accounting and finance personnel, developed a valuation report using a new discounted cash flow ("DCF") methodology and reconciled the results with the disclosed market capitalization methodology. To bridge the gap between the two evaluations, the Company's personnel relied on subjective opinions that the market undervalued Sequential. Using the DCF methodology, the Company concluded that goodwill was not impaired as of third quarter 2017.

**C.     The Individual Defendants Cause the Company to Issue Misleading Statements**

55.     On March 2, 2017, defendants Shmidman, Klein, Sweedler, Gossett, Hollander, Johnson, Leonard, Stewart, and Cohen caused Sequential to announce its fourth quarter and full year fiscal 2016 financial results in a press release. For the fourth quarter, the Company reported

$7.3 million net income, or $0.12 per diluted share, and $24.2 million adjusted EBITDA. For the full year, the Company reported $155.5 million revenue (a 76% year-over-year increase), a net loss of $0.8 million, and $83.1 million adjusted EBITDA.

56.      The above statements in ¶ 55 were materially misleading because they failed to disclose: (i) that the Company's goodwill was impaired by over $100 million; and (ii) that, as a result, the Company's net loss was understated.

57.      On March 14, 2017, defendants Shmidman, Klein, Sweedler, Gossett, Hollander, Johnson, Leonard, Stewart, and Cohen signed and caused Sequential to file its annual report on Form 10-K for the period ended December 31, 2016 (the "2016 10-K"). It affirmed the previously reported financial results and reported $307.7 million goodwill and $1.434 billion total assets.

58.      The above statements in ¶ 57 were materially misleading because they failed to disclose: (i) that the Company's goodwill was impaired by over $100 million; and (ii) that, as a result, the Company's net loss was understated.

59.      The 2016 10-K also stated its policy for assessing impairments to goodwill:

In the first step, the Company will compare the estimated fair value of the reporting unit with its carrying value.  The Company has determined that it has a single reporting unit and **considers its market capitalization (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor) to represent its estimated fair value**.  If the estimated fair value of the reporting unit exceeds its carrying amount, no further analysis is needed. **If, however, the estimated fair value of the reporting unit is less than its carrying amount, the Company will proceed to the second step and calculate the implied fair value of the reporting unit goodwill to determine whether any impairment is required.** The implied fair value of the reporting unit goodwill is calculated by allocating the estimated fair value of the reporting unit to all of the unit's assets and liabilities as if the unit had been acquired in a business combination. If the carrying value of the reporting unit's goodwill exceeds the implied fair value of the goodwill, an impairment loss is recognized in the amount of that excess. The Company has not recorded a goodwill impairment charge for any of the fiscal years ended December 31, 2016, 2015 or 2014.

60.    The above statements in ¶ 59 were materially misleading because they failed to disclose: (i) that, using the market capitalization and adjusting for a control premium, the Company had determined that its carrying value exceeded its fair value; and (ii) that, as a result, the Company should have proceeded to step two of the impairment test to measure the magnitude of the impairment.

61.    On May 4, 2017, defendants Murray, Klein, Sweedler, Gossett, Hollander, Johnson, Leonard, Stewart, and Cohen caused the Company to issue a press release announcing its first quarter 2017 financial results, reporting $307.7 million goodwill, $1.427 billion total assets, $40.8 million accumulated deficit, and $463.6 million total stockholders' equity.

62.    The above statements in ¶ 61 were materially misleading because they failed to disclose: (i) that the Company's goodwill was impaired by over $100 million; and (ii) that, as a result, the Company's total assets were overstated, accumulated deficit was understated, and total equity was overstated.

63.    On May 10, 2017, defendants Murray, Klein, Sweedler, Gossett, Hollander, Johnson, Leonard, Stewart, and Cohen caused the Company to file its quarterly report on Form 10-Q for the period ended March 31, 2017, affirming the previously reported financial results. It also stated that the Company "considers its market capitalization (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor) to represent its fair value," and that "the Company will recognize an impairment charge for the amount by which the carrying value exceeds the reporting unit's fair value."

64.    The above statements in ¶ 63 were materially misleading because they failed to disclose: (i) that, using the market capitalization and adjusting for a control premium, the Company had determined that its carrying value exceeded its fair value; (ii) that, as a result, the Company

should have proceeded to step two of the impairment test to measure the magnitude of the impairment; (iii) that the Company's goodwill was impaired by over $100 million; and (iv) that, as a result, the Company's total assets were overstated, accumulated deficit was understated, and total equity was overstated.

65.    On July 27, 2017, defendants Murray, Klein, Sweedler, Gossett, Hollander, Johnson, Leonard, Stewart, and Cohen caused Sequential to announce its second quarter 2017 financial results in a press release, reporting $304.1 million goodwill, $1.422 billion total assets, $38.3 million accumulated deficit, and $467.6 million total stockholders' equity.

66.    The above statements in ¶ 65 were materially misleading because they failed to disclose: (i) that the Company's goodwill was impaired by over $100 million; and (ii) that, as a result, the Company's total assets were overstated, accumulated deficit was understated, and total equity was overstated.

67.    On August 9, 2017, defendants Murray, Klein, Sweedler, Gossett, Hollander, Johnson, Leonard, Stewart, and Cohen caused the Company to file its quarterly report on Form 10-Q for the period ended June 30, 2017, affirming the previously reported financial results. It also stated that the Company "considers its market capitalization (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor) to represent its fair value," and that "the Company will recognize an impairment charge for the amount by which the carrying value exceeds the reporting unit's fair value."

68.    The above statements in ¶ 67 were materially misleading because they failed to disclose: (i) that, using the market capitalization and adjusting for a control premium, the Company had determined that its carrying value exceeded its fair value; (ii) that, as a result, the Company should have proceeded to step two of the impairment test to measure the magnitude of the

impairment; (iii) that the Company's goodwill was impaired by over $100 million; and (iv) that, as a result, the Company's total assets were overstated, accumulated deficit was understated, and total equity was overstated.

69.    On November 9, 2017, defendants Murray, Cooper, Sweedler, Gossett, Hollander, Johnson, Leonard, Stewart, and Cohen caused Sequential to announce its third quarter 2017 financial results in a press release, reporting $304.1 million goodwill, $1.381 billion total assets, $62.48 million accumulated deficit, and $443.73 million total stockholders' equity.

70.    The above statements in ¶ 69 were materially misleading because they failed to disclose: (i) that the Company's goodwill was impaired by over $100 million; and (ii) that, as a result, the Company's total assets were overstated, accumulated deficit was understated, and total equity was overstated.

71.    On November 13, 2017, defendants Murray, Cooper, Sweedler, Gossett, Hollander, Johnson, Leonard, Stewart, and Cohen caused Sequential to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2017, affirming the previously reported financial results. It also stated:

> During the quarter ended September 30, 2017, as a result of its qualitative assessment of the likelihood of goodwill impairment, the Company identified potential impairment indicators and determined that a quantitative assessment was necessary. *Fair value for the quantitative assessment was determined under an income approach using estimates of discounted future cash flows (the "DCF Method").* The DCF Method relies on assumptions such as the Company's projected future earnings and appropriate discount rates. *The Company corroborated the results of the DCF Method by reconciling to within a reasonable range of its market capitalization (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor).* Reconciling items identified included the benefit of the Company's *fully reserved tax assets for which the market capitalization may not be giving full value.* Based on the results of the quantitative assessment, the Company determined goodwill was not impaired for the period ended September 30, 2017.

72.     The above statements in ¶ 71 were materially misleading because they failed to disclose: (i) that the Company's goodwill was impaired by over $100 million; (ii) that there was a $300 million difference between the fair values calculated using the market capitalization and DCF methodologies; (iii) that the reconciliation of the two evaluations relied on subjective opinions of managements; (iv) that the reconciliation was made up of two factors, only one of which was discussed in the goodwill disclosures and an item comprising $100 million (i.e. one-third) of the reconciliation was excluded from the footnote; (v) that the "fully reserved tax assets" included in the disclosure were not fully reserved but were a calculated tax amortization benefit; and (vi) that if the Company had not changed to a DCF methodology, it would not have passed its annual impairment test.

### D.     The Truth Begins to Emerge

73.     On March 16, 2018, Sequential filed its annual report on Form 10-K for the period ended December 31, 2017 in which it recorded a $304.1 million impairment to goodwill.

### E.     The Individual Defendants Cause the Company to Issue a Materially Misleading Proxy Statement

74.     On April 24, 2020, defendants Conn, Sweedler, Gossett, Hollander, Johnson, Leonard, and Stewart issued a definitive proxy statement soliciting stockholder votes in advance f the Company's annual meeting to be held on June 5, 2020. In the proxy statement, these seven defendants solicited stockholder votes in favor of four management proposal, including: (i) a proposal to elect Gossett and Hollander to new terms as directors; and (ii) a proposal to amend the 2013 Stock Incentive Compensation Plan (the "2013 Plan") to increase the number of shares authorized for issuance thereunder by 2.5 million shares.

75.     The proxy statement disclosed that the Board had determined that defendants Conn, Sweedler, and Stewart were not independent. Specifically, Conn is not independent because he is

the current CEO of the Company, and Stewart is not independent because she served as the former Chief Creative Officer of the Company within the last three years. Sweedler is not independent because he is managing partner of Tengram Capital Associates, an entity affiliated with Tengram Capital Partners, L.P., to which the Company has made payments of $2.7 million in 2019.

76.     Regarding corporate governance and more specifically as to the accuracy of the Company's financial statements, the proxy statement stated, in relevant part:

> Audit Committee.   Our Audit Committee held six meetings during 2019, and separately acted by unanimous written consent on one occasion. The Audit Committee is chaired by Mr. Hollander, and includes Mr. Gossett and Mr. Leonard, Jr., all of whom qualify as "independent" directors within the meaning of Rule 5605(a)(2) of the Nasdaq Stock Market's Listing Rules and Rule 10A-3(b)(1) promulgated under the Securities Act of 1933, as amended (the "Securities Act"). The Board of Directors has determined that Mr. Hollander qualifies as an audit committee "financial expert" within the meaning of the rules and regulations of the SEC and that each of our other Audit Committee members is able to read and understand fundamental financial statements and has substantial business experience that results in that member's financial sophistication. Among other responsibilities, the Audit Committee reviews the scope and results of quarterly reviews and the year-end audit with management and the independent auditors, reviews and discusses the adequacy of our internal controls, and recommends to the Board of Directors selection of independent auditors for the coming year. The Audit Committee operates under a written charter, which was adopted by the Board of Directors and is available on our website www.sequentialbrandsgroup.com in the section titled "Corporate Governance".

77.     The 2013 Plan authorizes the issuance of shares of the Company's common stock for equity awards to Sequential's employees and directors. As of December 31, 2019, no shares remained available for future grant pursuant to the plan. Equity pursuant to the 2013 Plan is effectively awarded at the discretion of the Board, according to the proxy statement:

> Administration.   The 2013 Stock Incentive Plan is administered by the Compensation Committee of the Board of Directors or by any other committee designated by the Board of Directors (in this proposal, the "Committee" and the "Administrator"). Members of the Committee, which consists of at least two non-employee directors, each of whom meet applicable independence requirements as determined by the Board and such additional regulatory or listing requirements as the Board may determine to be applicable or appropriate, are appointed by the Board and can be removed by the Board at any time. Except as prohibited by

applicable law or the applicable rules of any stock exchange, the Committee may delegate all or any part of its responsibilities and powers to one or more of its members or to any person or persons selected by it, except that the Committee may not (1) delegate to any executive officer of the Company or its affiliates, or a committee that includes any such executive officer, the Committee's authority to grant awards, or the Committee's authority otherwise concerning awards, awarded to executive officers of the Company or an affiliate; (ii) delegate the Committee's authority to grant awards to consultants unless any such award is subject to approval by the Committee; or (iii) delegate its authority to correct defects, omissions or inconsistencies in the 2013 Stock Incentive Plan. Subject to the provisions of the 2013 Stock Incentive Plan and the specific duties delegated by the Board to the Committee, and subject to the approval of any relevant authorities, the Administrator has the full discretionary authority to operate, manage, administer and interpret the 2013 Stock Incentive Plan. All decisions, determinations, and interpretations of the Administrator are final and binding and conclusive on all award recipients.

78.    The proxy statement solicited shareholder approval of an amendment to the 2013 Plan to increase the number of shares of common stock reserved for issuance thereunder by 2.5 million shares. If approved, the total number of shares reserved for issuance would be 2.5 million, which represents 3.7% of the Company's common stock outstanding as of April 9, 2020.

79.    The proxy statement was materially misleading for the following reasons: (i) it failed to disclose that the Company had unreasonably delayed the recognition of an impairment to goodwill during fiscal 2016; (ii) it failed to disclose that Sequential was under SEC investigation related to the belated disclosure of goodwill impairment; (iii) it misrepresented the Board's activities with respect to financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (iv) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation. A reasonable shareholder would have found the truth to be material when deciding to vote for or against these proposals.

**F.      The Truth Continues to Emerge**

80.      On May 20, 2020, the Company disclosed that it was "cooperating with an investigation by the [SEC] into the Company's controls and practices surrounding the impairment analyses of goodwill and intangible assets in 2016 and 2017." It further stated that "the SEC began interviewing witnesses in connection with this matter" "[i]n the late third quarter and the fourth quarter of 2019."

81.      On June 9, 2020, Sequential filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the proxy statement. In particular: (i) Gossett and Hollander were reelected to new terms as directors; and (ii) the amendment to the 2013 Plan was approved by stockholders. The reelection of Gossett and Hollander and the approval of the amendment to the 2013 Plan based on the misleading statements contained in the proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and their continued enrichment at the expense of the Company's unaffiliated stockholders.

82.      On August 14, 2020, Sequential disclosed that it had received a Wells Notice on July 17, 2020 related to the SEC's investigation. According to the Wells Notice, "the SEC staff ha[d] made a preliminary determination to recommend that the SEC file an enforcement action against the Company that would allege certain civil violations of the federal securities laws."

83.      On December 11, 2020, the SEC filed a lawsuit charging Sequential with "failing to impair its goodwill as required by accounting principles and federal securities laws." Among other things, the lawsuit stated that "If Sequential had timely recorded the impairment to goodwill for the fourth quarter of 2016, then Sequential's reported loss for 2016 have been 54 times larger. The impairment would have equaled 33 percent of recorded goodwill and 7.0 percent of total assets."

84.     On this news, the Company's stock price fell $2.03, or 11%, to close at $16.20 per share on December 11, 2020, on unusually heavy trading volume.

## VI.     DAMAGES TO THE COMPANY

85.     As a direct and proximate result of the Individual Defendants' conduct, Sequential has been seriously harmed and will continue to be harmed. Such harm includes, but is not limited to:

    a)      Legal fees incurred in connection with the SEC lawsuit;

    b)      Any funds, including penalties, paid to settle the SEC lawsuit; and

    c)      Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Sequential.

86.     In addition, Sequential's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired. The Company still has not fully admitted the nature of its false statements and the true condition of its business. The credibility and motives of management are now in serious doubt.

87.     The actions complained of herein have irreparably damaged Sequential's corporate image and goodwill. For at least the foreseeable future, Sequential will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Sequential's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

88.     Plaintiff brings this action derivatively in the right and for the benefit of Sequential to redress injuries suffered, and to be suffered, by Sequential as a direct result of breaches of fiduciary duty by the Individual Defendants and violation of Section 14(a) of the Exchange Act.

Sequential is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

89.     Plaintiff will adequately and fairly represent the interests of Sequential in enforcing and prosecuting its rights.

90.     Plaintiff has continuously been a shareholder of Sequential at times relevant to the wrongdoing complained of and is a current Sequential shareholder.

91.     When this action was filed, Sequential's Board of Directors consisted of defendants Sweedler, Gossett, Hollander, Johnson, Leonard, Stewart and non-party directors Conn, Dionne, and Mazzucchelli.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Conn**

92.     Conn serves as Sequential's CEO, and therefore is not independent under NASDAQ listing rules.  As an employee, Conn derives substantially all of his income from his employment with Sequential, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.  As a result, demand is futile as to him.

**Defendants Gossett, Hollander, and Leonard**

93.     Gossett, Hollander, and Leonard served as the members of the Audit Committee at relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  In their capacities as Audit Committee members, Gossett, Hollander, and Leonard reviewed and approved the disclosures regarding the Company's goodwill impairment policy and compliance

with GAAP.  As alleged herein, Gossett, Hollander, and Leonard failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Sequential's SEC filings and other disclosures.  Thus, Gossett, Hollander, and Leonard breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendant Sweedler**

94.     Sweedler is a managing member of Tengram Capital Associates, an entity affiliated with Tengram Capital Partners, L.P., to which the Company made payments of $2.7 million in fiscal 2019, and therefore is not independent under NASDAQ listing rules. As a result, demand is futile as to him.

**Defendant Stewart**

95.     Stewart served as the Company's Chief Creative Officer within the last three years, and therefore is not independent. As a result, demand is futile as to her.

## COUNT I
### Against the Individual Defendants for Breach of Fiduciary Duty

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sequential's business and affairs, particularly with respect to issues as fundamental as public disclosures.

98.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Sequential.

99.     In breach of their fiduciary duties owed to Sequential, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

100.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

101.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sequential has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II
### (Against Conn, Sweedler, Gossett, Hollander, Johnson, Leonard, and Stewart For Violations of Section 14 of the Exchange Act)

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Specifically, the Company's proxy statement filed on April 24, 2020 violated § 14(a) and Rule 14a-9 because: (i) it failed to disclose that the Company had unreasonably delayed the recognition of an impairment to goodwill during fiscal 2016; (ii) it failed to disclose that Sequential was under SEC investigation related to the belated disclosure of

goodwill impairment; (iii) it misrepresented the Board's activities with respect to financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (iv) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.

104.    In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

105.    The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The proxy statement solicited and obtained shareholder votes for: (i) director nominees; (ii) ratification of the Company's independent auditor; (iii) executive compensation; and (iv) amendment to the 2013 Stock Incentive Compensation Plan. The proxy statement was an essential link in the accomplishment of the continuation of defendants continued violation of their fiduciary duties.

106.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Sequential, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of Sequential and that plaintiff is an adequate representative of the Company;

B.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and violations of the Exchange Act;

C.    Declaring that Defendants have breached their fiduciary duties to Sequential;

D.    Directing Sequential to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect

Sequential and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Sequential's oversight of its disclosure procedures; and

4.      a provision to permit the stockholders of Sequential to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on defendants' assets so as to assure that plaintiff on behalf of Sequential has an effective remedy;

F.      Awarding to Sequential restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: January 20, 2021

Of Counsel:

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiff Christopher Delmonico*